IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs October 3, 2017

## STATE OF TENNESSEE v. ERNEST BUTLER, aka ANTONIO BUTLER

**Appeal from the Criminal Court for Shelby County**
**No. 15-01445      Lee V. Coffee, Judge**

_____

### No. W2017-00136-CCA-R3-CD

_____

The Defendant, Ernest Butler, aka Antonio Butler, was convicted of first degree felony murder and being a convicted felon in possession of a firearm. He was sentenced to life imprisonment and fifteen years, respectively, to be served consecutively. On appeal, he argues that the evidence is insufficient to sustain the murder conviction. We disagree and affirm the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

James E. Thomas (on appeal) and Juni S. Ganguli (at trial), Memphis, Tennessee, for the appellant, Ernest Butler, aka Antonio Butler.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Alanda H. Dwyer and Ann L. Schiller, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### FACTS

While his three companions, who were not aware of his intentions, waited in a vehicle on July 19, 2014, the Defendant entered Midway Liquors in Memphis, where he purchased a pack of cigarettes and became angry at the clerk, Kent Smith, whom he shot and killed. During the incident, the victim returned fire, striking the Defendant in the

arm. A surveillance camera recorded the shooting, as well as the Defendant's taking money from the cash register. We will review the trial testimony.

Joy Smith testified that she had been married to the victim for thirty-five years at the time of his death. She viewed a photograph of the victim's body and identified it as that of her husband.

Officer Thomas Parker of the Memphis Police Department testified that on the day of the homicide, he went to Midway Liquors and obtained the video which had been made by the store's DVR recorder. From the video, he made individual still shots of the incident, which were admitted into evidence.

Todd Smith, the victim's son, testified that he and the victim arrived at Midway Liquors at about 8:00 a.m. on July 19, 2014. Mr. Smith operated The Beverage Center which was next door to the liquor store. Five to ten minutes after they arrived, Mr. Smith heard five or six gunshots and, looking through a window between the stores, saw a man with a gun in the liquor store. He pressed the panic button, secured a pistol, and ran outside. He saw a vehicle attempting to back out and pointed his pistol at the driver. The car hit a parked truck, and Mr. Smith ran into the liquor store, where he found his father's body facedown in the office. He immediately called 911 for assistance and, later, went to police headquarters where he viewed mug shots, but he was unable to identify the shooter.

Autumn Hill testified that, during the early morning hours of the day of the homicide, she was with the Defendant, who was known as "Bald Head," as well as Autry Hampton and Reginald Mull, at the Getaway Club near the victim's liquor store. Around 8:00 a.m., the four of them got into Mr. Hampton's car, and the Defendant complained that he had spent $40 on some "bad dope." Mr. Hampton told the Defendant to "let it go." Then, they saw the victim walk in front of their car; and Mr. Hampton said, "Look Bald Head, there go that man with that bag." The Defendant said, "Hold on," jumped out of the car, and went into the liquor store. Ms. Hill continued with her description of what happened next:

> A few seconds after he went in the store, I heard a loud pop, but I thought that I was just hearing things. And then a few seconds later we heard a pop, pop. So me and Autry looked at each other like, "What was that?" And then we saw [the Defendant] run out of the store. He appeared to be bleeding and he had like a hole in his arm, so that scared me. And he came to the vehicle and, you know, he was saying, "Autry, man, you gotta get me out [of] this lot."

Ms. Hill said that she got out of the car as the Defendant got back into it. She said she assumed that the Defendant had tried to rob the victim, who had shot him in the arm. She returned to the Getaway Club, presuming that the police would come looking for her and not wanting to appear guilty. To avoid that, she returned to the liquor store and talked with police officers about what had happened. Later, she identified the Defendant in a photographic lineup. During cross-examination, she acknowledged that the man she identified as Ernest Butler was actually his brother, Antonio Butler. During redirect examination, Ms. Hill said that the man she identified in the courtroom as Ernest Butler was the person who had run out of the liquor store with a pistol and who was bleeding from the arm and got into Mr. Hampton's car.

William D. Merritt testified that he was employed by the Shelby County District Attorney General's Office as a criminal investigator. He said that he transported to the Tennessee Bureau of Investigation a Colt .38 caliber revolver, four .38 caliber cartridges, and two .38 caliber cartridge casings recovered from 3064 Domar Street in Memphis, as well as a Taurus .45 caliber pistol and three .45 caliber cartridges recovered from the scene of the shooting.

Sergeant Eric Kelly of the Memphis Police Department testified that, knowing the shooter had been wounded by the victim, officers checked local hospitals and located an Antonio Butler, which was the name of the Defendant's brother, in a hospital in Mississippi, from where he was transported to a hospital in Memphis. Members of the Defendant's family told officers that the man in custody actually was Ernest Butler, not Antonio Butler. Officers verified this information through fingerprints and by interviewing the actual Antonio Butler.

Sergeant Kelly continued that, based upon information received from Autry Hampton and Reginald Mull, he retrieved, from an address on Domar Street, the pistol used by the Defendant to shoot the victim.

Officer David Galloway testified that he was a crime scene officer with the Memphis Police Department. He detailed his investigation at the scene, which included assisting another officer in taking photographs, preparing sketches of the interior of the liquor store, and securing as evidence a .9 millimeter handgun, a .45 caliber handgun, and a .38 caliber handgun. Additionally, he secured some metal fragments, which possibly had come from a spent bullet; a ball cap; a cell phone; and swabs of blood samples.

Officer Stacy Milligan, a crime scene investigator with the Memphis Police Department, testified that he took photographs at the scene of the shooting, a number of which were entered into evidence.

Reginald Mull testified that he had been charged with accessory after the fact in the same indictment as the Defendant. He said that on July 19, 2014, he was at the Getaway Club and asked Mr. Hampton to give him a ride home, and Mr. Hampton agreed. The two of them, along with Autumn Hill, got into Mr. Hampton's car, and the Defendant got in also. Mr. Mull was trying to get his cell phone to work and recalled the Defendant's getting out of the car. Ms. Hill jumped out of the car when the Defendant returned to the car. The Defendant had been shot in the right arm and was carrying what "looked like a snub-nosed 38." Mr. Mull testified what those in the car did:

> Like what he did, what happened, I was just like the three of us all were like he was bleeding and blood was shooting on me, so I'm trying to keep the blood from shooting all over me. So that's when I gave him my shirt . . . so I covered the wound so his blood would not shoot on me anymore.

Mr. Mull asked the Defendant what he had done, and the Defendant responded, "The man shot me." Mr. Mull was concerned that police officers would think that he and Mr. Hampton were involved, so he suggested that they drop the Defendant's pistol in the backyard of Mr. Mull's former residence on Domar Street. Afterwards, Mr. Hampton's girlfriend came by and gave the Defendant a ride and then took Mr. Mull and Mr. Hampton to Mr. Hampton's house where Mr. Hampton called the Memphis Police Department regarding the matter. To make it sound as if they were less involved, they told the police that the Defendant had gotten into the car with a pistol, shot it into the air, and made them drive him to where he wanted. However, this story was not true. Mr. Mull later told the police the truth about what had happened.

Autry Hampton testified that he had been charged with accessory after the fact in this case and that he had three prior felony convictions. He said that when the Defendant got into his car at the Getaway Club on July 19, 2014, the Defendant was mad because he had spent his last $40 on "some bad cocaine." Ms. Hill and Mr. Mull were also in Mr. Hampton's car. Mr. Hampton saw the victim carrying boxes and bags into the store, and the Defendant then got out of the car, saying, "I'm goin' in the store." Mr. Hampton denied knowing what was about to happen. Three or four minutes later, the Defendant, who was bleeding, came out and jumped in the backseat of Mr. Hampton's car, and Ms. Hill got out. The Defendant had a gun in his hand and told Mr. Hampton to "get [him] off this lot." Mr. Hampton said a man came running out of the store pointing a gun at Mr. Hampton's car, and Mr. Hampton then hit the back of someone's vehicle before pulling onto Winchester Road. Mr. Mull told Mr. Hampton to drive to Mr. Mull's former residence where they disposed of the gun in the backyard. The Defendant told Mr. Hampton, "Man, I F'd up. I messed up, man." The Defendant said he had robbed and shot the victim. Mr. Hampton admitted that he initially told the police that the Defendant

had carjacked him, but, after learning that the victim had died, Mr. Hampton told the police the truth.

The Defendant acknowledged that he had prior convictions for aggravated burglary, three robberies, and an attempted aggravated robbery in 1993; bank robbery in 1998; theft of property over $500 in 2011; and an additional theft of property over $10,000, for which he was not asked the date. He said he knew that, as a felon, he was not allowed to possess weapons or ammunition, but he did so because he was afraid of the Bloods gang. During the early morning of the homicide, he had been at the Getaway Club and was angry because he had been sold some bad cocaine. The Defendant explained his state of mind:

> I was behaving – I was mad. I was mad. I was like, "[Mr. Hampton], where's this guy at? He sold me some bad cocaine. Where's Ramone?" He's like, "Ramone left. He's not here anymore." I was like, "Well, man, he sold me some bad cocaine," and . . . I was going off. And I was like, "You sent me to him. You told me that you didn't have any, to go holler at Ramone. I need my money back."

The Defendant said that he then went to Midway Liquors with a fully loaded gun on his hip. Inside the store, he placed six dollars on the counter for a pack of cigarettes, and the victim "threw 'em on the counter." Angered by this, and the victim's refusal to return the Defendant's money, the Defendant shot the victim, who wounded him in return.

## ANALYSIS

We will review the Defendant's only issue on appeal, that the evidence is insufficient to sustain his felony murder conviction.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523, 527 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The indictment charged the Defendant with the first degree felony murder of the victim during the commission of an attempted robbery. Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2) (2014). The required mental state is that the Defendant possessed the intent to commit the underlying offense, which in this case was the robbery. Robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Id. §§ 39-13-202(b), -401.

The evidence against the Defendant was overwhelming. In brief, the Defendant admitted that he was the person shown on the store video confronting the victim, exchanging shots with him, and reaching into the cash drawer, supposedly only to recover the amount he had paid the victim for the pack of cigarettes. DNA testing established that the Defendant's blood was on the counter by the cash drawer.

Waiting outside in a vehicle were Autumn Hill, Reginald Mull, and Autry Hampton. All testified at trial that the Defendant returned to the car after the shooting, himself wounded in the right arm during the exchange of gunfire. The Defendant testified that he shot the victim as the victim threw the pack of cigarettes purchased by the Defendant onto the counter. From this proof, a reasonable jury could have concluded

that the Defendant committed first degree felony murder as he attempted to rob the victim.

## <u>CONCLUSION</u>

Based upon the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE